# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| LAURA C.[1] , | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:20-CV-1066-MGG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Laura C. ("Ms. C.") seeks judicial review of the Social Security

Commissioner's decision denying Ms. C.'s application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the

Social Security Act ("Act"). This Court may enter a ruling in this matter based on the

parties' consent pursuant to 28 U.S.C. § 636(c)(1) and 42 U.S.C. § 405(g). [*See* DE 8]. For

the reasons discussed below, the Court **REMANDS** the Commissioner's decision.

I.    **OVERVIEW OF THE CASE**

Ms. C. filed an application for DIB and SSI on April 20, 2018, alleging a disability

onset date of May 11, 2013. Ms. C.'s application was denied initially on August 28, 2018,

and upon reconsideration on October 29, 2018. Following a hearing on February 10,

2020, an Administrative Law Judge ("ALJ") issued a decision on May 13, 2020, which

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name and last initial only.

affirmed the Social Security Administration's denial of benefits. The ALJ's decision became the final decision of the Commissioner when the Appeals Counsel declined review on July 22, 2020. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005).

Ms. C. timely sought judicial review of the Commissioner's decision on October 28, 2020. Ms. C. filed his opening brief on October 29, 2021, and the Commissioner filed her Memorandum in Support of Decision on December 9, 2021. This matter became ripe on December 23, 2021, when Ms. C. filed her reply.

## II.   APPLICABLE STANDARDS

### A.    Disability Standard

To qualify for DIB, a claimant must be "disabled" as defined under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity ["SGA"] by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity is defined as work activity that involves significant physical or mental activities done for pay or profit. 20 C.F.R. § 404.1572.

The Commissioner's five-step sequential inquiry in evaluating claims for DIB and SSI under the Act includes determinations as to: (1) whether the claimant is engaged in SGA; (2) whether the claimant's impairments are severe; (3) whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404; (4) whether the claimant can perform his past relevant work based upon his RFC; and, if not, (5) whether the claimant is capable of

2

performing other work. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920[2]. The claimant bears the burden of proof at every step except Step Five, where the burden of proof shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000).

### B.    Standard of Review

This Court has authority to review a disability decision by the Commissioner pursuant to 42 U.S.C. § 405(g). However, this Court's role in reviewing social security cases is limited. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The question on judicial review is not whether the claimant is disabled; rather, the Court considers whether the ALJ used "the correct legal standards and [whether] the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2007).

The Court must uphold the ALJ's decision so long as it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). Substantial evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence has also been understood as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). The Supreme Court has also noted that "substantial evidence" is a term of art in administrative law, and that "whatever the meaning of 'substantial' in other contexts,

---

[2] Regulations governing applications for DIB and SSI are almost identical and are found at 20 C.F.R. § 404 and 20 C.F.R. § 416 respectively. Going forward, this Opinion and Order will only refer to 20 C.F.R. § 404 unless explicit distinction between the DIB and SSI regulations is necessary.

the threshold for such evidentiary sufficiency is not high" in social security appeals. *Biesek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The Court reviews the entire administrative record to determine whether substantial evidence exists, but it may not reconsider facts, reweigh the evidence, resolve conflicts of evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

On the other hand, an ALJ's decision cannot stand if it lacks evidentiary support or inadequately discusses the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). At a minimum, the ALJ must articulate her analysis of the record to allow the reviewing court to trace the path of her reasoning and to be assured the ALJ has considered the important evidence in the record. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not required to address every piece of evidence in the record so long as she provides a glimpse into the reasoning behind her analysis to build the requisite "logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Building a logical bridge requires the ALJ to "confront the evidence in [the plaintiff's] favor and explain why it was rejected." *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016); *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). The ALJ cannot "cherry-pick" facts from the record to support a finding of non-disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Furthermore, an ALJ may not disregard a line of evidence that is contrary to her findings. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the ALJ fails in her

4

responsibility to build a logical bridge between the evidence and her conclusions, the case must be remanded. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Where the ALJ's decision is not supported by substantial evidence, remand is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). Conversely, "[a]n award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id.* (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

### III.   ANALYSIS

#### A.    The ALJ's Decision

Ms. C.'s hearing before an ALJ on her applications for DIB and SSI took place on February 10, 2020, in Valparaiso, Indiana. On May 13, 2020, the ALJ issued her written decision finding that Ms. C. was not disabled, conducting the requisite five-step analysis for evaluating claims for disability benefits. 20 C.F.R. §404.1520.

At Step One, an ALJ's inquiry focuses on whether a claimant is engaging in substantial gainful activity. Here, the ALJ determined that Ms. C. had not engaged in substantial gainful activity since May 11, 2013. [DE 14 at 17].

At Step Two, an ALJ's inquiry focuses on whether a claimant's impairments are severe. For an impairment to be considered severe, an impairment or combination of impairments must significantly limit the claimant's ability to perform basic work-related activities. 20 C.F.R. § 404.1521. Here, the ALJ found that Ms. C. suffers from the severe impairments of degenerative disk disease of the cervical and lumbar spine, chemical induced bronchial hyperactivity with continued cigarette smoking for six

years with cessation in May 2019, obesity, anxiety disorder, post-traumatic stress disorder (PTSD), and depressive disorder [DE 14 at 18]. These impairments are considered "severe" because they significantly limit Ms. C's ability to perform basic work activities [*Id.*; *see also* 20 C.F.R. § 404.1520(c)].

Conversely, an impairment is considered non-severe when the medical evidence establishes only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to perform basic work functions. *See, e.g.,* 20 C.F.R. § 404.1522; S.S.R. 85-28, 1985 WL 56856 (Jan. 1, 1985). Here, the ALJ found that that Ms. C. had the following non-severe medically determinable impairments: cervical cancer, cellular dysplasia, metastatic disease, and thyroid nodules. [DE 14 at 18].

At Step Three, the ALJ found that none of Ms. C.'s severe impairments, nor any combination of his impairments, meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, the ALJ found that Ms. C. failed to meet the listing for Abnormal gait or limitations, Chronic respiratory disorders, Asthma, Endocrine disorders, or Obesity. [DE 14 at 18-19]. Likewise, the ALJ found the severity of Ms. C's mental impairments did not meet or equal the criteria under SSR 12.04, 12.06, and 12.15. [*Id.* at 19]. However, in analyzing the Part B criteria, the ALJ found that Ms. C's mental impairments cause moderate limitations in understanding, remembering, and applying information, moderate limitations in interacting with others, moderate limitations in concentrating, persisting, or maintaining pace, and moderate limitations in adapting or managing oneself. [*Id.* at

6

20]. Finally, the ALJ found that Ms. C. had mild limitations in her ability to adapt or manage herself. [*Id.*].

At the Step Four analysis, the ALJ considered Ms. C.'s residual functional capacity ("RFC"). A claimant's RFC includes limitations for all medically determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). The RFC is the most that the individual can do despite his limitations. 20 C.F.R. § 404.1545(a). To determine a claimant's RFC, the ALJ must consider the claimant's symptoms, their intensity, persistence, and limiting effects, and the consistency of these symptoms with the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1545(a)(1). Physical exertion levels in an RFC are classified as either sedentary, light, medium, heavy, or very heavy. 20 C.F.R. § 404.1567. Here, the ALJ found that Ms. C. has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations:

> except no more than occasional exposure to extreme heat and cold, fumes, odors, dust, gases and poor ventilation; no work with the public; and occasional interaction with coworkers and supervisors.

[DE 14 at 21].

Based on this RFC, the ALJ found ALJ determined that Ms. C. was unable to perform her past relevant work. [*Id.* at 27]. Ms. C. had prior work experience as a companion (DOT #309.677-010), a semi-skilled position. However, based on the ALJ's determination of her RFC, the ALJ found that Ms. C. was unable to perform past relevant work as actually or general performed [*Id.* at 27-28]. Accordingly, the ALJ moved on to last step in the five-step sequential analysis.

7

At Step Five, while the burden of proof shifts to the Commissioner, the Commissioner need only show that the claimant can perform some type of substantial gainful work existing in the national economy in substantial numbers. 42 U.S.C. § 423(d)(2)(A). In this matter, the ALJ asked a vocational expert ("VE") to testify regarding which occupations, if any, Ms. C. can perform. *See* S.S.R. 83-12. Typically, VEs use information from the Dictionary of Occupational Titles ("DOT") to inform their assessments of a claimant's ability to perform certain types of work. S.S.R. 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). Here, the VE, using the DOT, identified three separate jobs that Ms. C. could still perform—assembler (DOT #706.687-010), packer (DOT #737.587-010), assembler (DOT #739.687-066), and inspector (DOT #669.687-014)— which, respectively, have 196,000 jobs, 5,600 jobs, 25,000 jobs and 12,000 jobs in the national economy.

Concluding that Ms. C. could make an adjustment to other work that existed in substantial numbers, the ALJ determined that Ms. C. was not under a disability, as defined in the Act, from her alleged onset date through the date of ALJ's decision on May 13, 2020. [DE 14 at 29].

**B.    Issues for Review**

In her opening brief, Ms. C. makes one overall assertion—that the ALJ erred in creating her RFC because she failed to reconcile it with the medical opinions. [DE 18 at 12]. As to her RFC, Ms. C. contends that the ALJ erred in several ways—(1) that the ALJ did not explain adequately why she rejected certain medical opinions; and (2) failed to build a logical bridge from the evidence to her conclusion [*Id.* at 14].

8

In essence, Ms. C. argues that the ALJ's analysis is based on "cherry-picked" evidence, with the ALJ's decision ignoring evidence in the record that undermined her conclusion. *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014). Specifically, Ms. C. contends that the ALJ's RFC, which allows for occasional exposure to respiratory irritants is inconsistent with every medical opinion and not supported by substantial evidence.

Finding that the ALJ's RFC analysis failed to adequately evaluate limitations from all of Ms. C.'s impairments and that the ALJ failed to address evidence contrary to her conclusions, especially considering Ms. C.'s medically determinable severe restriction to being exposed to respiratory irritants, remand is appropriate.

## C.    Discussion

In establishing an RFC, an ALJ is directed to base the RFC on "all relevant medical and other evidence." 20 CFR § 404.1545(a)(3). In this case, the objective medical evidence shows that Ms. C. suffers from pulmonary restrictions caused by direct exposure to chlorine gas in her workplace on May 7, 2013. [DE 14 at 456]. As a result of being exposed to the chlorine gas for two-to-three minutes, Ms. C. experienced coughing, chest tightness, shortness of breath, watery eyes, burning in nose and throat, and dizziness [*Id.*].

On July 18, 2013, Dr. David Crabtree (Springfield, IL) conducted a physical examination of Ms. C., and found that she had decreased breath sounds diffusely, bibasilar rales/crackles, and prolonged expiratory time [*Id.* at 457]. Testing of Ms. C.'s pulmonary function was consistent with restriction and diffusion abnormality [*Id.* at

455]. Consequently, Dr. Crabtree prescribed Advair, Albuterol, Prednisone, and Augmentin to treat Ms. C.'s symptoms [*Id.*].

On July 2, 2013, Ms. C. returned to Dr. Crabtree. He found that Ms. C. was somewhat improved, but that she still complained of dyspnea or labored breathing [*Id.* at 452]. Testing showed significant improvement, and Dr. Crabtree was uncertain about the reasons that Ms. C. continued to suffer from symptoms. [*Id.*].

On August 20, 2013, Ms. C. revisited Dr. Crabtree, and she complained of continued shortness of breath. [*Id.* at 449]. She felt that she was receiving very little benefit from the prescription medicine and reported worsening dyspnea. [*Id.*]. Tests showed a predominant restriction on pulmonary function and a positive methacholine result. [*Id.* at 448].

Ms. C. was referred to the Internal Medicine/Lung Center at Washington University School of Medicine to determine whether she had a workplace-associated pulmonary condition. [*Id.* at 416]. On August 29, 2013, she met with Peter Tuteur, M.D. [*Id.*]. Dr. Tuteur reviewed Ms. C.'s medical records and conducted a physical examination. [*Id.*]. She reported that, while she had continued smoking, she almost never smoked more than half a cigarette per day, but that had persistent environmental exposure to cigarette smoke. [*Id.*]. She also reported she was symptomatic when exposed to perfume, cologne, hairspray, and cooking odors. [*Id.*].

The exam noted that Ms. C. was uncomfortable. [*Id.* at 417]. Dr. Tuteur observed that Ms. C.'s nasal mucosa were slightly inflamed. A CT scan indicated extensive mediastinal and hilar calcification and irregular heterogeneously distributed bronchial

wall thickening. [*Id.*]. Other tests noted that her FEVI value fell significantly following

exercise and positive methacholine result. [*Id.*]. In his report, Dr. Tuteur commented:

> Unequivocally, Ms. [C.] has **chemical (irritant) induced bronchial hyperactivity**. This condition is not an allergic phenomenon, but one due to the exposure to irritant low molecular weight chemicals such as the compounds generated when bleach is added to hydrochloric acid solution. The history of no previous pulmonary problems, immediate symptomatology, failure to respond acutely only in an incomplete way to bronchodilator medication, and continued exacerbation when exposed to a wide variety of ubiquitous irritant is quintessentially diagnostic of this problem [i.e., chemical (irritant) induced bronchial hyperactivity].
>
> Treatment must follow not only with ongoing scheduled medication such as Advair and ProAir to blunt an inadvertent exposure to a trigger, but also to maintain exquisite environmental control eliminating those situations, conditions and material that tend to exacerbate symptoms. Consequently, **it is medically contraindicated for her to return to work in the Nelson Center or any other environment which, even from time to time, may be associated with the presence of such triggers. Ideally a home based work solution should be sought.** *[emphasis added]*.
>
> I have not only counseled the patient, but also her family (mother) that the home should be free of ambient tobacco smoke, cleaning solutions, using exhaust fans to eliminate cooking fumes, etc.

[*Id.* at 418].

Ms. C. revisited Dr. Crabtree on October 1, 2013, and reported shortness of

breath and coughing. [*Id.* at 445]. Dr. Crabtree advised her to stay away from triggers

that could aggravate her symptoms and continued her on the existing medications. [*Id.*].

On December 2, 2013, she visited Dr. Crabtree again, and again complained of shortness

of breath and coughing. [*Id.* at 441]. Pulmonary testing showed a very mild reduction in

diffusion capacity. [*Id.* at 442]. Dr. Crabtree changed her Advair prescription to Dulera.

[*Id.* at 441]. Ms. C. was allowed to work with restrictions so long as she was not exposed

to chemical. [*Id.*]. When Ms. C. returned to see Dr. Crabtree on March 4, 2014, she reported more frequent occurrences of coughing, congestion and wheezing. [*Id.* at 437]. She reported frequently awaking at night with coughing and shortness of breath. [*Id.*]. She suffered from an attack when a plumber used chemicals in her workplace. [*Id.*]. Pulmonary testing confirmed much more reactivity. [*Id.*]. Based on history and her statements, her condition had degraded since her prior visit. [*Id.*]. Dr. Crabtree prescribed Montelukast to be added to her list of medications. [*Id.* at 436]. On April 8, 2014, Ms. C. returned to Dr. Crabtree, and he noted that she seemed to be "much better symptomatically," which she attributed to being away from her work environment. [*Id.* at 433]. Dr. Crabtree noted that the "data would suggest that she is not feigning these episodes." [*Id.*]. Ms. C. followed up with Dr. Crabtree on May 8, 2014, and complained of shortness of breath. [*Id.* at 430]. She related increasing incidences of asthma and severe attacks, and Dr. Crabtree believed she could not return to her prior employment. [*Id.*] He opined, "it does appear that this lady is left with persistent bronchospasm post inhalation injury in the workplace" although she is not "permanently or totally disabled." [*Id.*]. Dr. Crabtree diagnosed Ms. C. with bronchiolitis, reactive airway disease, shortness of breath, and respiratory condition (chronic) due to fumes and vapors. [*Id.*].

On July 26, 2017, Ms. C. went to see Alexander Molina, M.D. (Chesterton, Indiana) for breathing issues. [*Id.* at 533]. She reported having to use her nebulizer more over the past month and onset of migraines. [*Id.*]. Dr. Molina prescribed Prednisone and Imitrex. [*Id.*]. On October 4, 2017, Ms. C. returned to Dr. Molina complaining of pain in

the left side of her chest radiating into her neck and left with arm with numbness in her left arm. [*Id.* at 527]. Dr. Molina prescribed Prednisone and Cyclobenzaprine, and referred her for a pulmonology consult. [*Id.* at 530]. Spinal imaging showed degenerative changes. [*Id.* at 550, 553]. On November 1, 2017, Ms. C. revisited with Dr. Molina. [*Id.* at 522]. She again complained of neck and back pain, and reported shortness of breath and cough. [*Id.* at 522-23]. She reported being under stress and had started smoking again. [*Id.* at 522]. Dr. Molina prescribed Lexapro for anxiety and depression, and Duo-Neb for acute bronchitis. [*Id.* at 524]. He also noted that she has scheduled a pulmonary consult with Dr. Mazurek. [*Id.*].

On April 16, 2018, Ms. C. met with Douglas Mazurek, M.D. (Valparaiso, Indiana). [*Id.* at 572]. She reported that her Advair inhaler was not working to alleviate her symptoms. [*Id.*]. She also reported dyspnea when active and lying down, and that she could only go up five stairs without stopping. [*Id.* at 573]. Examination showed a dyspneic respiratory result. [*Id.* at 574]. Ms. C. returned to Dr. Mazurek on June 29, 2018, and reported no improvement. [*Id.* at 569] She continued to experience dyspnea with activity and when lying down. [*Id.* at 569-70]. Examination again produced a dyspneic respiratory result. [*Id.* at 570]. On March 19, 2019, Ms. C. followed up with Dr. Mazurek, and reported worsening shortness of breath and lung spasms. [*Id.* at 844-45]. She still experienced dyspnea with activity and when lying down, with associated pain. [*Id.* at 845]. A dyspneic respiratory effort was noted on examination. [Id.]. Dr. Mazurek prescribed Spiriva for breathing and Robaxin for back spasms. [*Id.* at 846]. His assessment was that Ms. C. continued to suffer from restrictive airways disfunction

syndrome (RADS) with intermittent severe symptoms. [*Id.* at 845] In his physical assessment questionnaire, Dr. Mazurek opined that Ms. C. could work "[a]s long as the work involved no dust, perfumes, odors, and limited physical exertion, [and] in controlled climate." [*Id.* at 624].

Under the prior regulatory regime, a treating physician's opinion was entitled to controlling weight if it was supported by medical findings and was consistent with substantial evidence in the record[3]. *Kaminski v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2)). However, even under the new regulation, an ALJ must account for the medical opinions of treating physicians in determining when the claimant has a severe impairment. 20 C.F.R. § 404.1520c. Yet, ALJs are not obligated to "blindly accept" a treating physician's opinion. *Schreiber v. Colvin*, 519 F. App'x 951, 958 (7th Cir. 2013) (*citing Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). If an ALJ chooses to discount a treating physician's medical opinion, she must minimally articulate her reasons for doing so. *Id.*; *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). In considering the medical opinion(s), the ALJ must account for the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including length, frequency, purpose, extent, and examining relationship); (4) specialization; and (5) other factors tending to support or contradict the medical opinion or finding. 20 C.F.R. § 404.1520c(c)(1)-(5). Although a treating physician's opinion is no longer entitled to

---

[3] The treating-physician rule has been modified to eliminate the "controlling weight" instruction for claims filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 (for claims filed before March 27, 2017), *with* 20 C.F.R. § 404.1520c (for claims filed after March 27, 2027). Here, Ms. C's claim was initiated after March 27, 2017, such that the "controlling weight" instruction would not apply. *Cf. Kaminski, 894 F.3d at 874* n.1.15

controlling weight, the regulation notes that a "medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder. *Id.* at § 404.1520c(c)(3)(iv). Likewise, the medical opinion or finding of a "medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty" than the opinion or finding of a medical source who is not a specialist. *Id.* at § 404.1520c(c)(4).

The ALJ's analysis of the opinions of Drs. Crabtree, Tuteur, and Mazurek was very limited. The ALJ parses the medical opinions to accept some but not all conclusions. Her opinion does not discuss—in detail—why she discounted the medical opinions of these treating physicians. Throughout her decision, the ALJ recited evidence from the record, including Ms. C.'s hearing testimony, subjective symptom reports, treatment notes from these doctors, and other medical and mental health professionals, test results, examination notes, and medical opinion evidence reflecting consideration of Plaintiff's entire medical record. Amidst the ALJ's recitation are references to "conservative treatment" and "normal examinations" without any critical analysis to shed light on how those results, combined with the rest of the record, contradict the opinions of the treating physicians—particularly Drs. Tuteur and Mazurek. Simply labeling a treatment as "conservative" or finding an examination as "normal" without explanation let alone any analysis does not implicate the treating physicians' opinions about a plaintiff like Ms. C.'s limitations. *See Thomas*, 826 F.3d at 961.

As such, the ALJ failed to connect specific evidence from the record to her conclusion that the opinions of Drs. Crabtree, Tuteur and Mazurek were not entitled to significant weight, especially considering the equivocal testimony by Dr. Stein. Without more, the Court cannot trace the path of the ALJ's reasoning and is not assured that she considered all the important evidence in the record. *See Scott,* 297 F.3d at 595.

While the determination as to whether a claimant is unable to work and disabled under the Act is reserved to the Commissioner, *Thomas,* 745 F.3d at 808, a medical record is not automatically disqualified as a medical opinion merely because it includes a judgment as to disability. *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012). Accordingly, the opinions of Drs. Crabtree, Tuteur and Mazurek are entitled to proper evaluation and weight as a treating source opinion, despite any references to Ms. C.'s ability to work.

Here, the ALJ's decision here does not demonstrate consideration of all the factors. The ALJ only implicitly suggests the nature and length of the treating relationship between Ms. C. and these doctors by extensively citing to treatment records. The ALJ does not adequate address the examining relationships that these doctors had with Ms. C., or whether that relationship provided them with a better understanding of her condition and prognosis. While the qualifications of these doctors may be inferred from the records, they are not specifically discussed by the ALJ. Both Drs. Tuteur and Mazurek are specialists in pulmonology, and the ALJs decision is bereft of any consideration of the persuasive nature of these specialty opinions. As such, the ALJ's incomplete analysis leaves the Court uncertain as to the effect of the

16

supportability and consistency factors in the weighing of the opinions of the Drs. Crabtree, Tuteur and Mazurek. Thus, on remand, the Commissioner should ensure that any analysis of the medical opinion evidence includes a complete consideration of all the Section 1520(c) regulatory factors, as necessary.

Instead of considering the weight to afford the opinions of the treating physicians, the ALJ found that all medical opinions were persuasive, at least in part. Apart from the state agency consultants, every medical doctor opined that Ms. C. should avoid exposure to any pulmonary trigger, *i.e.*, respiratory irritants like dust, perfumes, smoke, chemicals, gases, weather extremes, non-limited physical exertion, and odors. Dr. Mazurek opined that Ms. C. could work in a "controlled climate" so long as there was "no dust, perfumes, [and] odors." [DE 14 at 624]. The ALJ rejected that opinion—finding that Ms. C. did not need a controlled environment.

In response to a question about pulmonary irritants, Dr. Stein—an independent medical expert whom the ALJ found persuasive—agreed that Ms. C. should not be exposed to dust, perfume, or odors. [*Id.* at 46]. Dr. Stein stated that, "[i]f the patient [like Ms. C.] has a pulmonary problem, it would be wise to advise [no such exposure] even though there is no evidence that there are any specific things that bring it on." [*Id.*]. Dr. Stein noted that DLCO test indicated objectively that Ms. C. had a pulmonary impairment because, rather than 100%, there was only a 70 to 75% ability of the oxygen and carbon dioxide to get across the membranes from the lungs to the bloodstream. [*Id.* at 43, 46]. Dr. Stein opined that Ms. C. could work in an office environment with no

exposure to irritants rather than a factory or outdoor work environment with exposure.

[*Id.* at 48]. He stated,

> [Nobody wants her exposed to them and then being blamed for causing an attack. And it's easy enough to avoid those things. And, as I say, the normal indoor workplace does not have contaminations of that nature [i.e., dust, perfume, or odors].

[*Id.* at 49].

Yet, by finding all the medical opinions persuasive and without adequately addressing the medical opinions that Ms. C. should avoid ***all*** triggers, the ALJ concluded that Ms. C. could work with "no more than occasional exposure to extreme heat and cold, fumes, odors, dust, gases and poor ventilation . . . ." [*Id.* at 21]. The Commissioner asserts that the ALJ properly weighed the medical opinion in reaching her conclusion that Ms. C. could tolerate occasional exposure. [DE 19 at 11]. According to the Commissioner, the ALJ's decision was bolstered by the VE's testimony that an environment with no exposure would entail an "isolated or sterile environment which would not be compatible with these unskilled occupational bases." [DE 14 at 60].

Of course, the Court may only review the analysis presented by the ALJ and cannot base its review on the Commissioner's explanation of the decision. *See, e.g.,* *Phillips v. Astrue,* 413 F. App'x 878, 883–84 (7th Cir. 2010) ("We confine our review to the reasons offered by the ALJ and will not consider post-hoc rationalizations that the Commissioner provides to supplement the ALJ's assessment of the evidence."); *see also* *Villano v. Astrue,* No. 2:07 CV 187, 2009 WL 1803131, at *3 (N.D. Ind. June 23, 2009) (Commissioner's position limited to the ALJ's written decision, especially with respect

to the required bridge between facts and conclusions, thus prohibiting post-hoc rationalization); *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (finding that the Commissioner's arguments failed because the Commissioner advanced grounds in support of the decision that were not given by ALJ and relied upon facts not discussed by the ALJ).

While an ALJ need not mention every piece of evidence in the record, she must connect the evidence to the conclusion. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Here, as the ALJ failed to connect the evidence chronicled in the decision to her conclusion, the Court cannot trace the path of the ALJ's reasoning to be assured that the ALJ considered all the important evidence in reaching her determination that Ms. C.'s allegations were not consistent with the record. *Scott*, 297 F.3d at 595.

Moreover, because the ALJ found that all of the medical opinions with persuasive—at least in part—the ALJ was required to confront other evidence regarding Ms. C.'s ability (or lack thereof) to be exposed to pulmonary irritants and provide more detail about why those medical opinions were rejected. *Moore*, 743 F.3d at 1122–23. Without this analysis, this Court cannot follow the ALJ's logical bridge between the medical evidence and her conclusions and cannot engage in a meaningful review of the ALJ's decision. *See, e.g.*, *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). This is fundamental error.

Even giving the ALJ the benefit of the doubt in finding Dr. Stein's testimony more persuasive than the treating physicians, another major problem with the ALJ's opinion is that she relies on the VE to provide jobs in the national economy that are not

normally associated with an irritant-free office environment (assembler, packer, inspector). Obviously, numerous office environments would be contraindicated for Ms. C.—many of those office environments would contain dust, odors, gases, poor ventilation, and the like. Furthermore, the ALJ did not ask Dr. Stein to consider the types of jobs recommended by the VE and whether those jobs were in the type of office environment that he was recommending. Consequently, the ALJ's overstates the number of jobs in the national economy in each job category that would be available to Ms. C.

As such, the ALJ did not reconcile an apparent conflict between the jobs identified by the VE and the Dictionary of Occupational Titles ("DOT"). As this case is being remanded already for further consideration of Plaintiff's RFC, the Court directs the Commissioner to ensure that the Step Five analysis on remand comports with all relevant regulations and Social Security Rulings.

Finally, Ms. C. has raised other arguments regarding the ALJ's assessment of her RFC and the ALJ's analysis at Step Five. Ms. C. is free to raise these issues on remand.

## IV.    CONCLUSION

For the reasons stated above, this Court concludes that the ALJ's RFC analysis was not supported by substantial evidence because it failed to build a logical bridge between the evidence and the ALJ's conclusion and failed to address evidence that contradicted the ALJ's conclusion. Accordingly, the Court now **REMANDS** this action to the SSA for further administrative proceedings consistent with this opinion.

**SO ORDERED** this 22nd day of September 2022.

20

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge